1

2

3

4

IN THE UNITED STATES DISTRICT COURT

5

FOR THE EASTERN DISTRICT OF CALIFORNIA

6

7

MARILYN MAY SHIELDS,

8

      Plaintiff,

9

CIV-S-03-1614 DFL-PAN

10

    v.

11

MEMORANDUM OF OPINION
AND ORDER

DEPUTY SHERIFF TRACY, in his
individual capacity; DEPUTY

12

SHERIFF BIALORUCKI, in his
individual capacity; COUNTY OF

13

EL DORADO, DOES 1-100,

14

      Defendants.

15

16

17

    Plaintiff Marilyn Shields brings this § 1983 lawsuit against

18

Deputy Sheriff Nolan Tracy, Deputy Sheriff Carl Bialorucki, and

19

the County of El Dorado.  She alleges that she was unlawfully

20

seized, searched, and arrested by defendants without reasonable

21

suspicion or probable cause and that, in so doing, defendants

22

used excessive force.  She asserts several constitutional

23

violations, as well as state-law claims for violation of the

24

Unruh Act, assault and battery, and illegal imprisonment.

25

Defendants move for summary judgment on all claims.

26

I.

On Saturday, December 14, 2002, Shields, a law student, was walking near her house while studying flashcards for an upcoming law school exam.[1]  (Jones Decl. Ex. A at 55.)  Her walking path that day was "somewhat remote," taking her along a dirt path and through an open field which lead to a main road.  (Gumpert Decl. Ex. 1 at 112-13.)  There were few people in the area on the day in question.  (Id.)

It was a cloudy and slightly windy day.  (Jones Decl. Ex. A at 49, 121.)  Shields was wearing a short-sleeved cotton shirt, an unzipped jacket with outside pockets, blue jeans, and tennis shoes, and was carrying her law-school flashcards in her hand. (Defs.' SUF ¶ 2.)  She was not carrying identification.  (Jones Decl. Ex. A at 55.)  Nor was she carrying a weapon or other protective device (such as pepper spray).  (Id. at 61.)

As Shields started to return home, walking toward the dirt path and open field, Deputy Sheriff Tracy noticed Shields for the first time.  (Defs.' SUF ¶ 6.)  Tracy was on patrol in that area checking on office buildings where power outages and alarms had been reported.  (Gumpert Decl. Ex. 2 at 48.)  Tracy claims he noticed Shields because he thought it odd that a lone girl, dressed in light clothes, was walking into an open field in the middle of what he described as a "severe storm."  (Id. at 49-51.)

---

[1]  Because this is defendants' motion for summary judgment, the court presents the evidence in the light most favorable to Shields.

After first spotting Shields, Tracy checked on a few more businesses.  (Id.)   About five minutes later, he saw her again and decided to approach her.  (Id.)

Tracy drove towards her, parked his car, got out of the car, and started following Shields.  (Gumpert Decl. Ex. 2 at 52-53.) Shields heard the car stop and footsteps approach, looked back, and saw Tracy and his patrol car.  (Jones Decl. Ex. A at 68-69.) Tracy asked Shields what she was doing.  (Defs.' SUF ¶ 8.)   After Shields replied that she was taking a walk, Tracy asked Shields to show some identification.  (Gumpert Decl. Ex. A at 73.) Shields refused, stating that Tracy had no right to ask for identification. (Id.)

Following this initial exchange, Tracy asked her where she lived.  (Id. at 80-81.)   Shields told him that she did not have to answer his questions, citing her rights under the Privileges and Immunities Clause to take a walk without an ID.  (Id. at 81; Defs.' SUF ¶ 10.)  Following this remark by Shields, the two engaged in a short discourse on constitutional law.  (Jones Decl. Ex. A at 86-87.)

Toward the end of this conversation, Tracy announced that he needed to search Shields.  (Defs.' SUF ¶ 13.)   Shields refused. (Jones Decl. Ex. A at 98.)   Tracy did not inform Shields why he wanted to search her, or what his motivation was; rather, he simply ordered Shields to put her flashcards down.  (Id.) Shields complied, putting her flashcards in her coat pocket. (Id.)  Shields and Tracy continued to talk for several minutes,

with Shields telling Tracy that he did not have probable cause to search her. (Id. at 99; Defs.' SUF ¶ 14.)

Eventually, Tracy told Shields again that he needed to search her. (Jones Decl. Ex. A at 108; Gumpert Decl. Ex. 2 at 60.) Shields again refused, stating that if a search was necessary, she wanted a female officer. (Jones Decl. Ex. A at 109.) When Tracy replied that no women officers were on duty that day, Shields insisted that a supervisor be called. (Id. at 110.) During this portion of the event, Shields contends she did not have her hands in her pockets. (Gumpert Decl. Ex. 1 at 102.) At most, Shields states she rested her right thumb in her right jeans pocket. (Id.) Shields also denies Tracy ever told her to keep her hands where he could see them. (Id. at 109.)

The entire confrontation, to this point, had lasted about 15 minutes. (Defs.' SUF ¶ 18.) After Shields demanded that Tracy call a supervisor, there was a lull of approximately twenty minutes while they waited for another officer to arrive. (Jones Decl. Ex. A at 117-18.) Tracy stood near the front door of his car, and Shields stood about two feet behind the back of the car. (Id. at 116.) During this period, Shields studied her flashcards. (Id. at 119.) Tracy just stood there, sometimes staring at Shields, and other times turning his back on her while doing something else. (Id.) Shields states that she does not remember Tracy telling her to take her hands out of her pockets or away from her sides during this period. (Jones Decl. Ex. A at 117.)

4

After about twenty minutes, it started to rain.  (Defs.' SUF ¶ 19.)  Tracy told Shields to get in his police car, but Shields refused.  (Jones Decl. Ex. A at 122-23.)  Shields then told Tracy that she was going to walk over to some buildings close by and that Tracy could either walk with her or follow her in his car. (Id. at 124; Defs.' SUF ¶ 20.)  At that point, she turned around to start walking toward the buildings.

As Shields started to turn, Tracy made a sudden movement to grab Shields.  (Jones Decl. Ex. A at 125.)  Tracy grabbed Shields in a "mummy grip" from behind, grabbed her left wrist, twisted her left arm behind her back, swung her around and, in one continuous movement, pushed her against the back of the car. (Id. at 128.)  Once she was up against the car, while still gripping her from behind, Tracy reached under Shields's coat (though not her shirt), grabbed her left breast and then her right breast in succession, each for a second or less.  (Gumpert Decl. Ex. 1 at 135-37.)  Following these actions, there was about five seconds of calm.  (Id.)  Tracy then wrenched Shields's arm above her head, causing a loud popping sound.  (Id. at 137-38.) Shields fell to the ground in pain.  (Id. at 138-39.)

Shortly after Shields fell to the ground, a second deputy sheriff, Carl Bialorucki, arrived at the scene.  He was responding to the various radio dispatches put out by Tracy. (Gumpert Decl. Ex. 3 at 36.)  Upon his arrival, he attended to Shields, assessing her medical condition and assuring her that he was there to help.  (Id. at 40-41.)  After she stopped crying, he

produced a tape recorder and camera to record his conversation with her.  (Id. at 41.)  However, the paramedics arrived before he got beyond asking her name.  (Id.)

The paramedics transported Shields to the hospital, where she was treated for a dislocated and fractured left elbow. (Pl.'s SUF ¶ 3.)  Bialorucki did not accompany her to the hospital, but arrived later to ask some follow-up questions. (Gumpert Decl. Ex. 3 at 68.)  At the hospital, Bialorucki and his supervisor, Sergeant Walski, talked with Shields and asked her some additional questions.  (Id.)  Shortly after this conversation, Bialorucki spoke with her again in the hospital and gave her a citation under Cal. Penal Code § 148 for delaying a police officer in his official business.  (Pl.'s SUF ¶ 4.)

He issued the citation at the direction of Walski and on behalf of Tracy, who was the "arresting officer."  (Gumpert Decl. Ex. 3 at 61, 68-69.)  When he gave her the citation, he explained that he was not arresting her, and that he was just the issuing officer.  (Id; Jones Decl. Ex. A at 168.)  Shields was never handcuffed, incarcerated, or required to post bond or bail, and did not have criminal charges filed against her.  (Defs.' SUF ¶ 32.)

After Shields was released from the hospital, she contacted the El Dorado Sheriff's Department to make a complaint about the incident and set up a meeting with an internal affairs supervisor.  (Gumpert Decl. Ex. A at 206.)  However, she later cancelled the meeting and never rescheduled it.  (Id. at 208-09.)

Therefore, an internal investigation was never conducted, and Tracy was not reprimanded or punished by the sheriff's department.  (Jones Decl. Ex. B at 118-19.)

Shields now brings this suit against Tracy, Bialorucki, and the El Dorado County.  She brings claims against Tracy and Bialorucki under § 1983, alleging that they violated her Fourth and Fourteenth Amendment rights by: (1) seizing, searching, and arresting her without reasonable suspicion or probable cause, and (2) using excessive force to affect the same; and (3) sexually assaulting her.  She also brings state-law claims against the two officers for violations the Unruh Act and illegal imprisonment.  Additionally, she brings a state-law claim against Tracy for assault and battery.  Finally, she asserts a § 1983 claim against El Dorado County for its failure to adequately train and supervise its officers and to investigate excessive force cases.

II.

Defendants Shields and Bialorucki move for summary judgment on all of plaintiff's claims against them.  They argue both that plaintiff has not established a constitutional or state-law violation and that they are entitled to qualified immunity.  The County of El Dorado also moves for summary judgment on the claim against it, on the ground that Shields has not established a basis for imposing municipal liability.

In deciding a claim of qualified immunity, the court must first decide if a constitutional right has been violated on the plaintiff's alleged facts.  Saucier v. Katz, 533 U.S. 194, 201,

121 S.Ct. 2151 (2001).  If so, the court must then decide whether

this right was clearly established at the time of the

unconstitutional conduct.  <u>Id.</u>  A right is "clearly established"

if "a reasonable official would understand that what he is doing

violates that right."  <u>Id.</u> at 202 (quoting <u>Anderson v. Creighton</u>,

483 U.S. 635, 640, 107 S.Ct. 3034 (1987)).  "The relevant,

dispositive inquiry in determining whether a right is clearly

established is whether it would be clear to a reasonable officer

that his conduct was unlawful in the situation he confronted."

<u>Id.</u>

A.  Defendant Tracy

    <u>1.   Fourth Amendment Search and Seizure Claim</u>

       The determination of whether a police officer's detention

and search of an individual violates the Fourth Amendment

requires a three-part analysis.  First, the court must determine

whether a "seizure" occurred.  While the Fourth Amendment applies

to all "seizures," not all encounters between a police officer

and an individual constitute a "seizure."  <u>Florida v. Royer</u>, 460

U.S. 491, 497-98, 103 S.Ct. 1319 (1983).  A seizure does not

occur "simply because a police officer approaches an individual,"

"asks a few questions," and wants to see some identification, so

long as a reasonable person would feel free to disregard the

police and go about her business.  <u>Florida v. Bostick</u>, 501 U.S.

429, 434, 111 S.Ct. 2382 (1991).  A "stop and frisk," however, is

a seizure.

       Second, if a seizure has occurred, the court must determine

whether the seizure was reasonable.  To be reasonable, seizures

must generally be supported by "probable cause."  Terry v. Ohio,

392 U.S. 1, 20, 88 S.Ct. 1868 (1968).  However, the Supreme Court

has created certain exceptions to this requirement.  For example,

the Court ruled in Terry v. Ohio that officers can conduct a

short, investigative stop of an individual based on a reasonable

suspicion that the individual was engaged in criminal wrongdoing.

Id. at 21-22.

     Relevant to the present case, courts have also recognized a

"community caretaker" exception to the probable cause

requirement.  Courts have consistently recognized that "police

officers are not only permitted, but expected, to exercise what

the Supreme Court has termed 'community caretaking functions,

totally divorced from the detection, investigation, or

acquisition of evidence relating to the violation of a criminal

statute.'"  United States v. King, 990 F.2d 1552, 1560 (10th Cir.

1993) (quoting Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct.

2523 (1973)).

     Under this exception, a police officer may seize a person

"in order to ensure the safety of the public and/or the

individual, regardless of any suspected criminal activity."

King, 990 F.2d at 1560; see also Winters v. Adams, 254 F.3d 758,

763-64 (8th Cir. 2001).  Like a Terry stop, a community

caretaking stop requires reasonable belief that the person poses

a danger to himself or the public.  This reasonable belief must

be based on "specific articulable facts and requires a reviewing

9

court to balance the governmental interest in the police officer's exercise of his or her 'community caretaking function' and the individual's interest in being free from arbitrary government interference."  King, 990 F.2d at 1560.

Third, even if the court finds that the seizure was reasonable, it must then determine whether a protective search of the individual was warranted in the situation.  Where an officer is justified in making a Terry or community caretaking stop, the officer may conduct a limited protective search of the individual for concealed weapons if he reasonably believes the individual is armed and presently dangerous.  Terry, 392 U.S. at 24.  "An officer need not be certain that the individual is armed; the issue is whether a reasonably prudent man could believe, based on 'specific and articulable facts,' that his safety or that of others is in danger."  United States v. Rideau, 969 F.2d 1572, 1574 (5th Cir. 1992) (quoting Terry, 392 U.S. at 27).

However, a Terry or community caretaking stop justifies "no more than a brief interrogation and, under proper circumstances, a brief check for weapons."  United States v. Robertson, 833 F.2d 777, 780 (9th Cir. 1987).  If the seizure goes beyond the allowed "brief and narrowly circumscribed intrusion, an arrest occurs, for which probable cause is required."  Id.  This is often called a "de facto arrest."  See, e.g., United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568 (1985).  "There is no bright-line for determining when an investigatory stop crosses the line and becomes an arrest."  United States v. Torres-Sanchez, 83 F.3d

1123, 1127 (9th Cir. 1996) (quotation omitted).  To determine

when that line has been crossed, a court must consider "all the

surrounding circumstances," including "the extent to which

liberty of movement is curtailed" as well as "the type of force

or authority employed."  Id.  In essence, this inquiry amounts to

a determination of whether the officer's action was "reasonably

related in scope to the circumstances which justified the

interference in the first place."  Id.

Tracy argues that summary judgment is appropriate on

plaintiff's Fourth Amendment unreasonable seizure, search, and

arrest claim against him for several reasons.  First, Tracy

asserts that his encounter with Shields was voluntary and did not

amount to a "seizure," given that he approached Shields only to

inquire whether she needed assistance and to help her if

necessary.  (Mot. at 7.)  Second, to the extent the encounter

ceased to be voluntary, Tracy contends the seizure was an

objectively reasonable community caretaking stop.  (Reply at

4-5.)  Third, Tracy asserts that any "search" of Shields was

reasonable given the totality of the circumstances.  (Mot. at 8.)

Finally, Tracy argues that, even if there was a constitutional

violation, he is entitled to qualified immunity because the

constitutional right was not clearly established in these

circumstances.  (Id. at 14-17.)

At the first step of the analysis, the court finds that,

under plaintiff's version of events, a "seizure" did occur at

some point during the encounter between Shields and Tracy.

Although the encounter may have started as a simple offer of assistance, it evolved into a seizure.  Specifically, a seizure arose when Tracy insisted repeatedly, over a span of twenty minutes, that he needed to search Shields, despite her strenuous protestations.  A reasonable person would not feel free to leave in these circumstances.  Moreover, a seizure undoubtedly occurred when Tracy grabbed Shields, wrestled her to the car, and conducted some sort of protective search.

Second, under Shields's version of events, a jury could find that the seizure was objectively unreasonable.  Defendants contend that Tracy reasonably believed that Shields posed a danger to herself or the public based on the following alleged facts: (1) Shields was walking alone near an open field in a "somewhat remote" area during a "severe storm"; (2) she was dressed inappropriately for such weather; and (3) she refused to answer basic questions about her identity, acted in a boisterous and erratic manner, and was pacing in a nervous fashion.  (Id. at 8; Gumpert Decl. Ex. 2 at 49-51, 55-59.)

However, many of these "facts" are disputed by Shields and cannot be considered on summary judgment.  Based on Shields's version of the encounter, the only basis for Tracy's community caretaking stop was that: (1) she was a woman walking on somewhat windy day near an open field in a "somewhat remote" area; (2) upon being approached by an officer, she refused to give her name, her address, or to show identification; and (3) she cited to her constitutional rights in demanding to be left alone.

These facts do not create the necessary reasonable suspicion. See <u>Royer</u>, 460 U.S. at 497-98 (an individual's refusal to listen or answer questions, without more, does not create reasonable suspicion).

Courts that have upheld community-caretaking stops based on a concern about drug use, intoxication, or other mental infirmity have done so only where there was articulable evidence supporting the officer's suspicion, such as the odor of alcohol, incoherent speech, physical infirmity, or bizarre actions. See, e.g., <u>Tinius v. Carroll County Sheriff Dep't.</u>, 321 F.Supp.2d 1064, 1075 (N.D.Iowa 2004) (finding valid a community-caretaking stop where individual walking along side a road was incapable of carrying on coherent conversation and was acting "bonkers," leading officers to conclude he was on drugs or intoxicated); <u>Gallegos v. City of Colorado Springs</u>, 114 F.3d 1024, 1029 (10th Cir. 1997) (finding valid a community-caretaking stop where individual walking down sidewalk in middle of night smelled of alcohol, was crying and walking down street with eyes over hands, and was unsteady on his feet); <u>Adams</u>, 254 F.3d at 764 (affirming community-caretaking stop where officers received a dispatch concerning a possibly intoxicated person, the individual refused to make eye contact with officers, and was acting in highly agitated state). No such undisputed facts are present in this case.

Moreover, several other facts cut against Tracy's argument. For instance, according to Shields, Tracy did not ask her questions relating to her safety or to her mental state; rather,

he only asked basic questions, such as, what she was doing, where did she live, and did she have identification.  Further, both Tracy and Shields agree there was a significant period of conversation before Tracy demanded to search her.  During this period, again based upon Shields's version of events, any questions about her mental competency should have been cleared up, as a woman who is walking with flashcards (suggesting a student studying) and quoting the constitution in a coherent manner does not suggest a mentally unstable person. Additionally, neither Bialorucki nor Sergeant Walski believed that Shields was mentally unstable, drunk, or on drugs after their interaction with her.  (Opp'n at 11.)

Finally, Tracy's "community caretaker" argument is belied by the length of the encounter.  A <u>Terry</u> or community caretaking stop must be temporary and last no longer than necessary to effectuate the purpose of the stop.  <u>Royer</u>, 460 U.S. at 500; <u>Sharpe</u>, 470 U.S. at 685-86 (stating that in considering length of time of investigatory stop, courts must examine whether police diligently pursued an investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the individual).  Here, the total length of the encounter was almost forty minutes.  Under plaintiff's version of events, this was much longer than necessary to determine that she was stable and not a danger to herself or others.  Accordingly, the length of the detention weighs strongly in favor of finding an unreasonable seizure.

1    Given that Tracy was not justified in "seizing" Shields, he

2    was also not justified in conducting a search for weapons.  See

3    King, 990 F.2d at 1557 ("For a protective search to be 'justified

4    at its inception,' the officer must not only harbor an

5    articulable and reasonable suspicion that the person is armed and

6    dangerous, the officer must also be 'entitled to make a forcible

7    stop.'") (citing Adams v. Williams, 407 U.S. 143, 146-48, 92

8    S.Ct. 1921 (1972)).  Accordingly, under plaintiff's version of

9    events, Tracy's search of Shields for weapons constitutes an

10   unreasonable search under the Fourth Amendment.

11   Even if Tracy's detention of Shields had been justified as a

12   community-caretaking stop, his search of Shields would still

13   violate the Fourth Amendment because on plaintiff's facts, he did

14   not have reasonable suspicion to believe that Shields was armed

15   and dangerous.  Defendants argue that the search was reasonable

16   because Shields was acting in a bizarre manner.  (Reply at 6.)

17   Defendants place special emphasis on Shields allegedly placing

18   her hands in her pockets repeatedly despite Tracy ordering her to

19   keep her hands visible at all times.  (Id.)

20   Again, however, on Shields's version of events, a genuine

21   factual dispute exists on this issue.  As noted above, much of

22   the evidence relating to the allegations of her "bizarre" actions

23   is in dispute.  Most importantly, Shields contends that Tracy did

24   not repeatedly ask her to keep her hands visible and that she was

25   not continually placing her hands in her pockets.  At most, she

26   admits she might have had her left thumb dangling in her left

jeans pocket during some portions of her conversation with Tracy.

Additionally, Shields presents evidence suggesting that Tracy did not feel threatened during this encounter.  For instance, Tracy allowed Shields to study her flashcards for twenty minutes without interference and turned his back on her several times during that time period.  Tracy never asked Shields for permission to pat-down her pockets.  Finally, Shields denies making a sudden movement toward her pockets as she turned around to leave; to the contrary, she claims she told Tracy specifically what she was planning to do -- walk to some nearby buildings to get out of the rain -- before making any movement to walk away.

Under this version of the encounter, Tracy did not have reasonable suspicion to believe that Shields was armed and dangerous.  Especially in cases where the person is stopped on suspicion of a non-violent offense or for a community-caretaking purpose, courts have generally required the presence of some "other circumstances" suggesting the individual is armed and dangerous to justify the further intrusion of a frisk for weapons.  See People v. Scott, 16 Cal.3d 242, 249, 128 Cal.Rptr. 39 (1976) (holding that officer was not justified in conducting a pat-down search before allowing individual into his car where officer had stopped to assist the individual who appeared to be intoxicated while holding a child and offered to give the individual a ride); Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.5(a) at 256-57.  Under Shields's version of events, there are no "other circumstances" justifying

the search.

Finally, Tracy is not entitled to qualified immunity for the Fourth Amendment unreasonable search and seizure claim.  Under Shields's version of events, a reasonable officer would be on notice that there was no reasonable belief that she posed a threat to herself or others.  Although the "reasonable suspicion" analysis is highly contextual and fact-specific, cases where the validity of a community caretaking stop is affirmed, as described above, all involve situations where there were significant, articulable facts supporting the officer's belief that the individual posed a danger to himself or the public.  Tracy has pointed to no such undisputed facts here that would lead a reasonable officer to believe he had the right to seize Shields.

For similar reasons, Tracy is also not entitled to qualified immunity for the weapons search.  As an initial matter, the law is clear that an officer must have legitimate grounds for forcibly detaining or seizing an individual before a right to search a person arises.  E.g., King, 990 F.2d at 1560; 4 Search and Seizure § 9.5(a).  Here, given that there is a genuine factual dispute over whether Tracy had any basis for seizing Shields, summary judgment should also be denied on the allegedly illegal protective search.  Additionally, no reasonable officer would believe he had the right to conduct a protective search absent some "other circumstances" suggesting that the individual was armed and dangerous.  Tracy has identified no such undisputed articulable facts here.

For the above reasons, Tracy's motion for summary judgment on Shields's Fourth Amendment seizure and search claim is DENIED.

## 2.  Fourth Amendment Excessive Force Claim

For similar reasons, summary judgment is inappropriate on plaintiff's claim of excessive force.  As in other Fourth Amendment contexts, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Graham v. Conner, 490 U.S. 386, 397, 109 S.Ct. 1865 (1989).  This reasonableness determination "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interest at stake."  Id. at 396 (internal quotations omitted).

> To assess the gravity of a particular intrusion on Fourth Amendment rights, the factfinder must evaluate the type and amount of force inflicted.  In weighing the governmental interests involved the following should be taken into account: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.

Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir. 1994).

Here, a jury could find that the force used by Tracy was objectively unreasonable.  Regarding the gravity of the intrusion, Tracy applied a wrist-lock technique with such force that, according to Shields, her left arm was twisted back behind her back and then wrenched above her head, resulting in a dislocated and fractured left elbow.  Thus, the level of force

1  employed was significant.

2      A reasonable jury could find that the force was used was

3  excessive.  Defendants do not contend that Tracy suspected

4  Shields of having committed any crime.  Additionally, under

5  Shields's version of the incident, there was no reason to believe

6  that Shields had a weapon and was trying to use it.  Finally,

7  according to Shields, she was not resisting Tracy's use of force.

8      Likewise, Tracy is not entitled to qualified immunity on

9  Shields's excessive force claim.  A reasonable officer would know

10 that it violates the Fourth Amendment to apply a wrist-lock grip

11 with such force as to dislocate a person's elbow when the person

12 is suspected of no crime and is moving away from the officer for

13 the declared purpose of seeking shelter from the rain.

14     3.  Fourteenth Amendment Claim

15     Shields also brings a substantive due process claim against

16 Tracy.  For conduct to constitute a substantive due process

17 violation, the action must be "so egregious, so outrageous, that

18 it may fairly be said to shock the contemporary conscience."

19 County of Sacramento v. Lewis, 523 U.S. 833, 848 n.8, 118 S.Ct.

20 1708 (1998).  Shields alleges that Tracy grabbed her breasts and

21 sexually assaulted her while he was searching her, thereby

22 infringing on her liberty interest in being free from

23 state-imposed violations of her bodily integrity.  (Opp'n at 31.)

24     Allegations of sexual assault by a governmental officer may,

25 in some circumstances, serve as the basis of a substantive due

26 process claim.  Hawkins v. Holloway, 316 F.3d 777, 784 (8th Cir.

2003).  However, Shields's claim is best analyzed under the

Fourth Amendment.  "[I]f a constitutional claim is covered by a

specific constitutional provision . . . the claim must be

analyzed under the standard appropriate to that specific

provision, not under the rubric of substantive due process."

Lewis, 523 U.S. at 843 (quoting United States v. Lanier, 520 U.S.

259, 272 n.7, 117 S.Ct. 1219 (1997)).  Noting this rule, the

Ninth Circuit has held that while sexual misconduct by a police

officer toward another is generally analyzed under the Fourteenth

Amendment, such allegations of sexual misconduct by a police

officer during a continuing seizure are more properly analyzed

under the Fourth Amendment.  Fontana v. Haskin, 262 F.3d 871,

881-82 (9th Cir. 2001).  A pat-down search, even one that

involves private areas, such as the groin or breasts, does not

violate the Fourteenth Amendment, although it might violate the

Fourth Amendment as discussed above.  See Greiner v. City of

Champlin, 816 F.Supp. 528, 543 (D.Minn. 1993), aff'd in part and

remanded in part on other grounds, 27 F.3d 1346 (8th Cir. 1994)

(collecting cases).  Summary judgment is GRANTED on Shields's

substantive due process claim against Tracy.

         3.  State-law claims

         Shields also brings several corresponding state-law claims

against Tracy based on the allegations described above.  For the

same reasons summary judgment is inappropriate on Shield's Fourth

Amendment claims, summary judgment is likewise inappropriate on

these claims.  First, summary judgment is inappropriate on

Shields's Unruh Act and assault and battery claims because the analysis used for plaintiff's Fourth Amendment claims also applies to these claims.  See Cal. Civ. Code § 52.1(a) (Unruh Act statute); Edson v. City of Anaheim, 63 Cal.App.4th 1269, 1274-75, 74 Cal.Rptr.2d 614 (1998) (holding that California courts apply same "objective reasonableness" test used for analysis of Fourth Amendment claims when analyzing the reasonableness of force used by an officer under an assault and battery claim).

Likewise, summary judgment is inappropriate on Shields's false arrest and imprisonment claim.  The tort of false imprisonment is: "(1) the nonconsenual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." Easton v. Sutter Coast Hosp., 80 Cal.App.4th 485, 496, 95 Cal.Rptr.2d 316 (2000). The torts of false arrest and false imprisonment are not separate torts, as the arrest is "but one way of committing false imprisonment." Asgari v. City of Los Angeles, 15 Cal.4th 744, 753 n.3, 63 Cal.Rptr.2d 842 (1997).  As with the other state-law claims, the determination that summary judgment in favor of Tracy is inappropriate on the Fourth Amendment claims precludes summary judgment in favor of Tracy on this claim.

Tracy's arguments to the contrary are without merit.  First, Tracy contends that, even if his encounter with Shields did constitute a seizure, she has no claim for false imprisonment because the arrest was not followed by imprisonment. (Reply at 20.)  However, "false imprisonment" is broadly defined to mean

1   "the unlawful violation of the personal liberty of another."

2   Cal. Penal Code § 236.   Even though Shields was never placed in

3   prison, she can still maintain a claim for false imprisonment.

4   See Watts v. County of Sacramento, 256 F.3d 886, 891 (9th Cir.

5   2001) (finding false imprisonment where officers unlawfully

6   entered and detained individual in her home without warrant).

7        Additionally, Tracy asserts that any "arrest" was authorized

8   because he had probable cause to suspect her of violating Cal.

9   Penal Code § 148(a), the penal code prohibiting resisting,

10  delaying, or obstructing a police officer in the discharge of his

11  duties.  (Reply at 21.)  However, § 148 only applies where the

12  officer is engaged in the performance of his duties.   People v.

13  White, 101 Cal.App.3d 161, 166, 161 Cal.Rptr. 541 (1980)

14  California courts have held that a police officer is not

15  performing or discharging the duties of his office when he makes

16  an unlawful arrest or uses excessive force in effecting the

17  arrest or detention.   Id.  Given there is a genuine dispute as to

18  whether the arrest was lawful, the court cannot determine whether

19  Tracy had probable cause to suspect her of violating § 148(a).

20       Finally, Tracy asserts he is entitled to discretionary

21  immunity under Cal. Gov't Code § 820.2.  (Mot. at 22.)  However,

22  § 820.2 does not provide immunity for false imprisonment claims.

23  See Wallis v. Spencer, 202 F.3d 1126, 1144-45 (9th Cir. 2000);

24  Cal. Gov't Code § 820.4.  For the above reasons, Tracy's motion

25  for summary judgment on all of Shields's state law claims is

26  DENIED.

B.  Defendant Bialorucki

     Shields also brings suit against Bialorucki for his role in the incident.  Although Shields admits that Bialorucki arrived on the scene after Tracy dislocated and fractured Shields's elbow and, therefore, was not present for the seizure or use of excessive force, she alleges that Bialorucki is liable on two grounds: (1) citing her for a violation of Cal. Penal Code § 148 where there was no basis to support the citation; and (2) for improperly continuing her arrest after arriving on the scene and failing to intercede on her behalf.  (Opp'n at 22-23.)  Based on these two theories, Shields alleges violations of the Fourth and Fourteenth Amendments, as well as state-law claims under the Unruh Act and for false arrest and imprisonment.

     Neither of these theories support liability against Bialorucki on any of the above claims.  Regarding the citation, Bialorucki was not the one who authorized the citation.  Rather, on the undisputed facts, Tracy was the "authorizing" officer and Sergeant Walski ordered Bialorucki to issue the citation because Tracy was not at the hospital.  Bialorucki's only role was to write the citation and hand it to Shields.[2]  Even if Bialorucki authorized the citation, however, the outcome would be the same. The Ninth Circuit has held that the issuance of a citation does

---

     [2]  Shields makes much of Tracy's and Bialorucki's admissions in their answers that they "arrested" Shields and issued her a notice to appear citation.  (Opp'n at 2-3, 16.)  However, whether Shields was "arrested" or "seized" for purposes of the Fourth Amendment is a legal conclusion, and judicial admissions are limited to matters of fact.  MacDonald v. Gen. Motors Corp., 110 F.3d 337, 341 (6th Cir. 1997).

not constitute the tort of false arrest, much less a

constitutional violation.  Graves v. City of Coeur D'Alene, 339

F.3d 828, 840 (9th Cir. 2003).  Therefore, Shields's attempt to

hold Bialorucki liable for false imprisonment merely for issuing

the § 148(a) citation must fail.

Nor does the issuance of the citation support Shields's

constitutional claims.  Shields was not "seized" by the issuance

of the citation and did not experience a loss of liberty or

property as a result of the citation, given that she was never

booked, taken into custody, or prosecuted.  Moreover, the Ninth

Circuit has held that the issuance of a "bogus" citation does not

"shock the conscience" so as to support a substantive due process

claim.  Johnson v. Barker, 799 F.2d 1396, 1400 (9th Cir. 1986)

(finding that filing and prosecuting plaintiff on "baseless"

charges did not "approach violating substantive due process").

Likewise, Shields's allegation that Bialorucki assisted in

continuing her arrest is insufficient to support Shields's

state-law or constitutional claims.  To be liable under § 1983,

Bialorucki must have been "personally involved" in the alleged

constitutional deprivations.  Wright v. Smith, 21 F.3d 496, 501

(2d Cir. 1994).  Officers become "personally involved" for the

purposes of § 1983 liability if they fail to intercede "when

their fellow officers violate the constitutional rights of a

suspect or other citizen."  Cunningham v. Gates, 229 F.3d 1271,

1289 (9th Cir. 2000) (internal citations omitted).  However,

officers can only be liable for failing to intervene when they

1   had a "realistic opportunity" to do so.  Id. at 1290.

2       Here, Bialorucki had no realistic opportunity to intervene

3   to end the "seizure."  Shields was "seized" long before

4   Bialorucki arrived.  Therefore, Bialorucki had no opportunity to

5   prevent the original seizure.  Moreover, from the time he arrived

6   on the scene to the time he issued her a citation Bialorucki had

7   no realistic opportunity to "un-arrest" her.  Shields was injured

8   when he arrived and had to be sent to the hospital immediately.

9       Bialorucki's interaction with Shields at the hospital does

10  not alter this conclusion.  Although Shields complains that

11  Bialorucki's actions at the hospital effectively continued

12  Shields's detention, this argument mischaracterizes Bialorucki's

13  role.  While at the hospital, Bialorucki asked Shields a few

14  questions as part of the investigation of the incident, was told

15  by his supervisor to issue a citation to Shields on behalf of

16  Tracy, and then issued her the citation.  Shields was free to

17  leave after Bialroucki issued the citation.  Bialorucki did

18  nothing to hold her at the hospital or anywhere else.

19      Even assuming that Bialorucki's alleged continuation of

20  Shields's seizure was a constitutional violation, Bialorucki is

21  entitled to qualified immunity on the claim.  Shields has not

22  cited, nor could the court find, a case applying the "duty to

23  intercede" requirement to a situation where an individual is

24  already "seized" and the late-arriving officer does not prolong

25  or exacerbate the detention.  Accordingly, a reasonable officer

26  in Bialorucki's situation would not be on notice that his actions

were unconstitutional.

For similar reasons, the alleged failure to intercede cannot sustain either plaintiff's Unruh Act claim or her claim for false imprisonment.  Accordingly, the court GRANTS Bialorucki's motion for summary judgment on all of plaintiff's claims against him.

C.   County of El Dorado

Shields asserts municipal liability against El Dorado County based on the following two alleged "policies" of the county.  First, Shields claims that El Dorado County had a policy of inadequately training and supervising its officers in "Officer Presence" and "Tactical Communications" skills.  (Opp'n at 24.) Second, Shields alleges that it was the policy and custom of El Dorado County to inadequately and improperly investigate citizen complaints of police officer misconduct.  (Id. at 24-25.)  To support these claims, Shields submits the written opinions and findings of her designated expert, Richard Clark.

For claims of inadequate training and investigation to form the basis of municipal liability, the inadequacy of the training or investigation must amount to "deliberate indifference to the rights of persons with whom the police come into contact."  City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197 (1989). Additionally, the identified policy must be "closely related to the ultimate injury."  Id. at 390.

Shields has not presented sufficient evidence in support of either alleged policy to avoid summary judgment on this claim. Regarding the "failure to train" claim, Shields contends that El

26

Dorado County is liable because it failed to provide additional training in tactical communications after the officers graduated from the basic POST training. (Clark Decl. Ex. B at 2.) The only evidence supporting Clark's opinion, however, is that the record in this case demonstrates that Tracy had lost or forgotten this skill and the department had done nothing to see that it was retained. (Id. at 18.)

This is insufficient evidence of "deliberate indifference" to survive summary judgment. As the Court in Harris held,

> [t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. . . . Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.

Harris, 489 U.S. at 391. Shields must show a pattern of similar tortious conduct by inadequately trained employees such that the county's continued failure to provide additional training can reasonably be deemed to rise to the level of deliberate indifference. Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 407-08, 117 S.Ct. 1382 (1997). Shields has presented no such evidence.

With regard to her "failure to investigate" argument, Shields presents evidence that from 1997 to the present, there were 34 excessive force/unlawful search and seizure/unlawful detention complaints filed with the sheriff's department and that

1  only one of these complaints was sustained.[3]   (Jones Decl. ¶ 7.)

2  In addition to these statistics, Shields points to several

3  alleged deficiencies in the investigation of her case --

4  including allegations that certain documents were mysteriously

5  lost or destroyed, that certain allegations were not sufficiently

6  investigated, and that no punishment was handed out.  (Opp'n at

7  27-28.)

8      This evidence is insufficient to avoid summary judgment on

9  this issue.  The allegations relating to the handling of her case

10 are insufficient to establish municipal liability.  A plaintiff

11 must do more than point to the flaws in the handling of her own

12 case to establish a pattern of violations rising to the level of

13 deliberate indifference.  Harris, 489 U.S. at 391.  Moreover,

14 because plaintiff never pursued an administrative claim, there is

15 no suggestion that the county ratified or affirmed Tracy's

16 conduct.  The statistics Shields cites also do not create a

17 material question of fact.  Plaintiff has not provided evidence

18 showing that these investigations were in any way incomplete or

19 biased; all she has shown is that complaints of excessive force

20 and unreasonable detentions are sustained one time out of thirty-

21 four.  Whether this is a high or low number, for example, as

22 compared to other jurisdictions, does not appear from any of the

23

24      [3]  Defendants object to the admissibility of these
25 statistics, arguing that the declarant, Shields's attorney, has
   not established the factual and mathematical basis for his
26 conclusions.  Given the court's decision to grant summary
   judgment in favor of defendants on this claim, there is no need
   to reach this issue.

1  evidence submitted.

2      Finally, defendants' evidence shows that there is a strong

3  policy in place regarding internal investigations.  The policy

4  requires that an internal affairs investigation be initiated in

5  each case and that the investigation be completed unless the

6  complaining witness refuses to cooperate or the employee facing

7  the potential adverse action resigns.  (Neves Decl. Ex. D.)

8  Furthermore, the department had explicit policies requiring all

9  department employees to participate in, and cooperate honestly

10 and fully with, all internal affairs investigations.  (<u>Id.</u> Ex.

11 E.)  Failure to do so would result in the imposition of

12 discipline.  (<u>Id.</u>)  In sum, the evidence presented by Shields in

13 support of her municipal liability claim is insufficient to raise

14 a triable question of fact regarding the alleged "deliberate

15 indifference" of El Dorado County.  Accordingly, the court GRANTS

16 summary judgment in favor of El Dorado County on plaintiff's

17 municipal liability claim.

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

III.

The court GRANTS summary judgment in favor of defendants Bialorucki and the County of El Dorado on all claims against them.  As to defendant Tracy, the court GRANTS summary judgment in favor of Tracy on plaintiff's substantive due process claim, but DENIES summary judgment on all of plaintiff's remaining claims against Tracy.


IT IS SO ORDERED.

Dated: 6/21/2005


_____

DAVID F. LEVI
United States District Judge